## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No: 21-cr-291-3 |
| | : | |
| | : | 18 U.S.C. § 111(a)(1) |
| **v.** | : | |
| | : | Redacted |
| **KYLE YOUNG,** | : | |
| | : | |
| **Defendant.** | : | |

**FILED**
MAY -5 2022
Clerk, U.S. District and
Bankruptcy Courts

### STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Kyle Young, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings under way inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still under way and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however,

shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Kyle Young's Participation in the January 6, 2021, Capitol Riot*

8.  On January 6, 2021, the U.S. Capitol Police ("USCP") requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer M.F. The officer was wearing a full Metropolitan Police Department uniform, to include a marked helmet and tactical vest, with his police badge, duty belt, and official insignia clearly displayed.

9. At approximately 2:45 p.m., a group of USCP and MPD officers had formed a police line at one of the two glass doorways on the lower west terrace that leads inside the U.S. Capitol building to prevent the mob from entering the building through that entrance.

10. At around 2:54 p.m., the defendant joined the rioters in the lower west terrace archway who were pushing against the police line. While in the tunnel, the defendant held a strobe light toward the police line and pushed forward a stick-like object. The defendant also helped fellow rioters in throwing a large audio speaker toward the police line. The speaker landed in the area where other rioters were confronting law enforcement and struck one of the defendant's fellow rioters, Wilmar Jeovanny Montano Alvarado, in the head, drawing blood. During his time in the tunnel area, the defendant was joined by one of his minor children, who accompanied him throughout the day.

11. At approximately 3:15 p.m., Officer M.F. came to the front of the police line. As officers began to push the rioters back from the doors around 3:18 p.m., another individual pulled Officer M.F. through the tunnel and into the crowd of rioters outside. Once Officer M.F. was in the mob, various members of the crowd, including the defendant, physically assaulted Officer M.F.

12. At 3:19 p.m., the defendant is visible on Officer M.F.'s body-worn camera reaching toward Officer M.F. The defendant held Officer M.F.'s left wrist in his right hand and pulled the officer's arm away from his body. When the defendant grabbed Officer M.F.'s wrist, the defendant knew that the officer was engaged in the performance of official duties as an officer from the Metropolitan Police Department who was assisting the United States Capitol Police.

13. Officer M.F. was then swept further into the crowd. The defendant turned toward where rioters were pulling another officer, U.S. Capitol Police Officer M.M., into the crowd. While Officer M.M. was swept into the crowd, the defendant reached toward him and made

contact with the officer's helmet.

14.     Officer M.F. sustained significant and painful injuries on January 6, 2021. As an individual repeatedly applied a taser to the back of Officer M.F.'s neck, Officer M.F. experienced excruciating pain and was rendered momentarily helpless. He can be heard screaming on his body-worn camera. The tasing caused burn marks to the back of Officer M.F.'s neck that resulted in scarring. Shortly after being tased, Officer M.F.'s body-worn camera shows the efforts of those around him trying to elicit a response from him, indicating that he lost consciousness for more than two minutes.

15.     Officer M.F. was then transported to the Emergency Room, where



16.



17.     In a December 26, 2020, Facebook post, the defendant had asked his Facebook followers if they would like to join him on January 6 at the "stop the steel [sic]" rally in Washington, D.C.

18.     The defendant does not have first-hand knowledge of the actions of Albuquerque Head, Thomas Sibick, or Daniel Rodriguez in Washington, D.C. on January 6, 2021 and therefore could not truthfully testify about their activities on that day.

Respectfully submitted,

MATTHEW M. GRAVES
Acting United States Attorney
D.C. Bar No. 481052

By:     /s/
KIMBERLY PASCHALL
CARA GARDNER
Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I, Kyle Young, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/27/22

Kyle Young
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/27/2022

Sam Moore
Attorney for Defendant