**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-291-3 (ABJ)** |
| **KYLE JAMES YOUNG,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Kyle Young to a term of incarceration of 86 months, which is in the middle of the guideline range as calculated by the United States Probation Department, three years of supervised release, at least $2,000 in restitution,[1] and the mandatory $100 special assessment.

I. **INTRODUCTION**

The defendant, Kyle Young, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] As noted below, the Court should defer a restitution determination for up to 90 days.

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Young, an HVAC laborer with a significant criminal history, joined the storming of the police line in the tunnel on the Lower West Terrace ("LWT") for fifteen minutes, where he aggressively assaulted and harassed a line of dramatically out-numbered Washington, D.C. Metropolitan Police Department ("MPD") and United States Capitol Police officers. Young then exited the tunnel and continued to assault officers who were pulled into the crowd. Throughout, Young's 16-year-old son, who Young brought to the Capitol, closely followed on his heels.

Young enthusiastically and tenaciously participated in the assault on police in the tunnel at the LWT—the scene of some of the most barbaric violence on January 6. In an effort to impair officers' vision and distract them, Young repeatedly held a strobe light toward the officers fighting to hold the line against the onslaught of rioters. Young also passed a taser to another rioter, taking the time to show him how to use it. That rioter, Daniel Rodriguez, later repeatedly applied a taser to the back of MPD Officer Michael Fanone's neck as Young joined in the assault. While in the tunnel, Young worked with another rioter to throw a large audio speaker toward the police line, which missed the officers and struck a fellow rioter on the head, drawing blood. Young also jabbed a pole toward the police line where officers were holding plastic riot shields to protect themselves.

After leaving the tunnel, Young pivoted to assault two police officers who were pulled into the crowd in quick succession. When Young spotted Officer Fanone being pulled into the crowd, he purposefully moved toward the attack, and joined it at a pivotal moment—restraining Officer Fanone's wrist by pulling it away from his body seconds after the officer was repeatedly tased and amid shouts to "Kill him with his own gun." Young's restraint of Officer Fanone prevented the officer from protecting his service weapon at a time when the officer's life was in danger and gave Young's co-defendant Thomas Sibick an opening to forcibly remove Officer Fanone's badge from

his chest and his police radio from a pocket on the front of his vest.

After Young's grip on Officer Fanone's wrist was broken by a riot shield careening through the crowd, Young quickly turned to where rioters were pulling United States Capitol Police ("USCP") Officer M.M. into the mob. Young purposefully moved through the crowd toward Officer M.M., who was disoriented and temporarily blinded by bear spray. Young then assaulted Officer M.M.

As explained below, this Court should impose a substantial prison sentence in this case that takes into account all of Young's violent criminal conduct on January 6. The Government recommends that the Court sentence Young to 86 months incarceration, which is a term in the middle of the guidelines range as calculated by the United States Probation Department. Such a sentence reflects the gravity of Young's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The

people who were committing those violent acts did so because they had the safety of numbers.")
(statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Young's plea
agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S.
Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote
count of the Electoral College of the November 3, 2020, Presidential election. By approximately
1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.
Vice President Mike Pence was present and presiding, first in the joint session, and then in the
Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary
and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police
were present and attempting to keep the crowd away from the building and the proceedings
underway inside. At approximately 2:00 p.m., certain individuals forced their way over the
barricades and past the officers, and the crowd advanced to the exterior of the building. Members
of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows
of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police
attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the
crowd forced their way in, breaking windows and assaulting police officers along the way, while
others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate,
including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.

All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 3-7; PSR ¶¶ 17-21.[3]

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the LWT. As explained *infra*, Young was in the thick of that violence, working his way to the front of the mob with his minor son in order to personally and forcefully contribute to it.

The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is

---

[3] References to the PSR are to the draft Presentence Investigation Report, ECF 133.

a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  Exhibit 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of USCP, assisted by officers from the MPD, were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defensive line here after retreating from an earlier

protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a Congressional hearing on July 27, 2021 regarding the assault on the Capitol on January 6, Congresswoman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.
>
> ****
>
> Imagine if they had caught the two members of Congress that were just 40 feet from where you all were…. Well, I'm telling you that you were our last line of defense and during the exact period of time Officer Hodges, in that video where you were sacrificing your body to hold that door, it gave Congresswoman Rice and I, and the Capitol police officers who had been sent to extract us the freedom of movement on that hallway to escape down the other end of that hallway. And I shudder to think about what would have happened had you not held that line. I have two young children, I have a 10-year-old son and a 7-year-old daughter, and they're the light

of my life. And the reason I was able to hug them again was because of the courage that you and your fellow officers showed that day. And so, just a really heartfelt thank you. I think it's important for everybody though, to remember that the main reason rioters didn't harm any members of Congress was because they didn't encounter any members of Congress, and they didn't encounter any members of Congress because law enforcement officers did your jobs that day and you did it well.

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police, including the abduction and tasering of Officer Fanone and the assault of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. Officer Fanone described one of his colleagues' actions that day:

8

In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is no exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including Members of Congress.

**B.      Defendant's Role in the January 6, 2021, Attack on the Capitol**

Kyle Young participated in the January 6 attack on the Capitol after traveling from his home in Redfield, Iowa. His crimes are documented through a series of videos obtained by law enforcement officials, including videos filmed by private citizens, body-worn camera from MPD Officer Fanone, and USCP surveillance footage from the Capitol. The evidence of Young's assaults on police officers in the area of the LWT tunnel is irrefutable.

Young made plans to go to Washington, D.C. at least a week and half before January 6, 2021, creating the Facebook post in the screenshot below.



**Exhibit 2**

***Young's Assaults of Police Officers in the Tunnel at the Lower West Terrace***

Once at the Capitol on January 6, 2021, Young joined the mob on the LWT, where he participated in the mob's sustained and violent attack on beleaguered and out-numbered police officers.

<u>Entry into the Tunnel with Minor Son</u>

At approximately 2:43 p.m., Young entered the tunnel on the LWT followed by his 16-year-old son. *See* Exhibit 3.1.[4] Young pushed through the crowd in the tunnel toward the glass doors where MPD Officers were fighting to hold the line against the onslaught of rioters. After pushing through the crowd for approximately a minute and half, Young and his son disappear from view on the surveillance footage.

---

[4] All video exhibits will be provided to the Court and defense counsel.



**Exhibit 3.1A**[5]



**Exhibit 3.1B**

Young appears again on the surveillance footage at approximately 2:45:43 p.m., following by his minor son, as the crowd is pushed back by the officers guarding the entrance to the Capitol building. Young is talking on the phone at this time.

---

[5] Screenshots that include Young's minor son have been edited to block the minor's face from view.



**Exhibit 3.1C**

<u>Chanting and Pushing Against the Police Line</u>

At 2:46:12 p.m., another rioter, Gina Bisignano,[6] is visible holding up her phone to record a video, and she pans to Young, who says something as the camera pans away.



**Exhibit 3.1D**

In Bisignano's video, which was recovered from her iCloud account as part of the investigation into her activities at the Capitol that day, Young, who is off-camera at the time, can

---

[6] *U.S. v. Gina Bisignano*, 21-cr-036 (CJN).

be heard saying "This needs to be documented!" Bisignano pans to Young, who is briefly visible at the 00:22 minute marker and says, "I'm documenting it." Young nods when he is briefly visible on camera, and then the camera pans away as Young replies, "Document it!" *See* Exhibit 4.



**Exhibit 4A**

At the 00:33 minute marker on Bisignano's video, a rioter whose raised fist is visible behind Bisignano beings chanting, "Police stand down!"



**Exhibit 4B**

As this chant starts at approximately 2:46:44 on the surveillance footage, Young is visible holding up his phone for a period of time in the manner of someone recording a video. Young's

phone was recovered and collected as evidence when he was arrested on April 14, 2021. A subsequent review of his phone revealed no relevant photos or videos from January 6, 2021.[7]



**Exhibit 3.1E** (*screenshot brightened for better visibility*)

Around 2:46:50 p.m., Young started chanting with others in crowd, and then pounded rhythmically on the wooden wall at the mouth of the tunnel. The surveillance video does not have audio, so the point at which the chanting started is estimated by comparing the surveillance video to Bisignano's video. Specifically, the raised fist visible in Exhibit 4B can be matched to the raised fist in Exhibit 3.1E. The man with the raised fist started the chant that Young joined several seconds after it started.

---

[7] The only relevant items recovered from Young's phone were texts with his wife on January 28, 2021, and February 3, 2021, discussing the BOLO of Young and speculating about the likelihood that he would eventually be arrested. As discussed *infra*, Young attempted to turn himself in on January 27, 2021, after he first saw the BOLO of himself.



**Exhibit 3.1F**

Around 2:50 p.m., Young joined the crowd in pushing forward against the police line at

the glass doors, which is not visible on camera. Young and other members of the crowd briefly

advanced before being pushed back and expelled from the tunnel. *See* Exhibit 3.2.[8]



**Exhibit 3.2A** (*screenshot brightened for better visibility*)

Young is also visible at this point on a video posted to YouTube with the title

"UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol" ("Unbelievable

---

[8]  The surveillance footage is divided into two separate videos. Exhibit 3.2 continues with
footage from the LWT Tunnel after 2:50 p.m.

Video").[9] See Exhibit 5 at approximately minute marker 00:25-1:00 until Young disappears back into the tunnel as he pushed toward the police line again.



**Exhibit 5A**

<u>Young Hands a Taser to Daniel Rodriguez</u>[10]

At 2:52 p.m., Young pushed back into the tunnel and had a brief conversation with a fellow rioter wearing tactical gear.

---

[9] This video can be found at https://www.youtube.com/watch?v=cJOgGsC0G9Um, and is provided as Exhibit 5.

[10] *U.S. v. Daniel Rodriguez*, 21-cr-246-1 (ABJ). Rodriguez was indicted for, among other charges, using a taser on the back of MPD Officer Michael Fanone's neck after the officer was pulled from the tunnel and into the crowd by Young's co-defendant, Albuquerque Head.



**Exhibit 3.2B** (*screenshot brightened for better visibility*)

Ten seconds later, Young reached toward fellow rioter Daniel Rodriguez, tapped him on the shoulder and handed him a small, dark object that is the size and shape of a taser.



**Exhibit 3.2C** (*screenshot brightened for better visibility*)

Several seconds later, Young again interacted with Rodriguez, showing him something with the taser that made a small, red light appear and then a blue flash.

17



**Exhibit 3.2D** (*screenshots brightened for better visibility*)

Six seconds later, Rodriguez held up the taser. About 30 seconds after that, Rodriguez again held up the taser, this time causing a blue flash to appear on it like the blue flash Young caused earlier.



**Exhibit 3.2E** (*screenshots brightened for better visibility*)

<u>Young's Use of a Strobe Light to Visually Impair Officers</u>

At 2:54:25 p.m., Young held up a strobe light, directing it toward the police line, and

pushed forward until he was no longer visible on the surveillance footage by 2:55 p.m.



**Exhibit 3.2F**

The top of Young's head occasionally appears toward the bottom right of the screen through 2:56:17 p.m., at which point the rioters in the tunnel, including Young, jointly push forward far enough that Young is no longer visible on the screen.



**Exhibit 3.2G** (*screenshot brightened for better visibility*)

Young becomes visible again at the bottom of the screen at 2:58:46 p.m.



**Exhibit 3.2H** (*screenshot brightened for better visibility*)

At around 2:59:30 p.m., Young's son is visible directing the strobe light toward the police line. Young takes the strobe light from his son at 2:59:45 p.m. and directs it toward the police line himself.



**Exhibit 3.2I**

Young is visible during this time from a different angle on the Unbelievable Video, which shows Young from behind pointing the strobe light at officers as he stands towards the front of the line of rioters who are confronting police. *See* Exhibit 5 at minute marker 3:13 to 4:00, and 5:10-5:15.



**Exhibit 5B**



**Exhibit 5C**

<u>Young and Another Rioter Throw a Large Audio Speaker Towards Officers</u>

At 3:00 p.m., Young and a fellow rioter, Devlyn Thompson,[11] together threw a large audio speaker toward the police line. The speaker landed in the area where other rioters were confronting police and struck one of Young's fellow rioters, Wilmar Jeovanny Montano Alvarado,[12] in the

---

[11] *U.S. v. Devlyn Thompson*, 21-cr-461 (RCL). Thompson plead guilty to a violation of 18 U.S.C. § 111(a)(1) and (b) for assaulting a police officer with a baton, but the speaker throw was part of the relevant conduct cited at sentencing, where he received 46 months of incarceration.

[12] *See U.S. v. Wilmar Jeovanny Montano Alvarado*, 21-cr-154 (RJL) (Document 1-1 at 5; "Montano also reported that he ended up being hit in the head by a speaker that was thrown in the crowd which caused him to bleed.").

head, drawing blood. This assault is visible on surveillance video at 3:00:02 p.m. A few seconds

after throwing the speaker, Young quickly holds the strobe light up again at 3:00:08 p.m. before

passing it back to his son.



**Exhibit 3.2J** (*screenshot brightened for better visibility*)



**Exhibit 3.2K** (*screenshot brightened for better visibility*)

Multiple YouTube videos also depict Young and Thompson throwing the speaker at the

police. Exhibit 6 shows the incident at minute marker 1:06 to 1:11.[13]



**Exhibit 6A**

At minute marker 1:12, Young can be seen briefly holding up the strobe light again and directing it at the police line before passing the flashlight to his minor child.



**Exhibit 6B**

---

[13] Exhibit 6 can be found at *jan6archive.com_youtube_L4AADYTHDTE.mp4*.

23

Exhibit 5 shows Young and Thompson throwing the speaker at minute marker 8:52 to 8:54 in the Unbelievable Video.



**Exhibit 5D**

At minute marker 8:55, Alvarado is visible holding and rubbing the back of his head. He then moved back from the front of the line and pulled his hand away from his head to examine fresh blood on his hand at minute marker 9:06-07 before retreating from the tunnel.



**Exhibit 5E**

In another open-source video, Exhibit 7, Alvarado is visible in this 16-second clip holding

his bandaged head with blood seeping through the bandage.[14]



**Exhibit 7A**

<u>Young Thrusts a Pole at Officers</u>

At 3:01:01 p.m., Young used a long pole or stick that was being passed through the crowd

to jab towards the police line. Young and his son then exited the tunnel around 3:02 p.m.

---

[14]    Exhibit    7    is    available    at    https://projects.propublica.org/parler-capitol-
videos/?id=KDH68TyHUiw5.



**Exhibit 3.2L** (*screenshot brightened for better visibility*)

The same assault is visible in the Unbelievable video at minute marker 9:45 to 9:56,

showing the view from behind, which depicts Young jabbing the pole toward the plastic shields

that police officers are holding up.



**Exhibit 5F**

***Young's Assaults Outside the Tunnel: Officer Michael Fanone and Officer M.M.***

<u>Assault of MPD Officer Fanone</u>

At approximately 3:15 p.m., MPD Officer Michael Fanone arrived at the front of the police line in the tunnel on the LWT. As officers began to push the rioters back from the doors around 3:18 p.m., Young's co-defendant, Albuquerque Head, grabbed Officer Fanone around the neck and pulled him into the crowd of rioters, which included Young. Surrounding by a hostile mob, Officer Fanone was repeatedly assaulted by multiple individuals, including Young, who joined the attack by restraining Officer Fanone's wrist when the officer was at his most vulnerable—immediately after he had been repeatedly tased on the back of his neck by Daniel Rodriguez. Young continued to restrain Officer Fanone for several seconds, during which time, another of Young's co-defendants, Thomas Sibick, reached toward Officer Fanone to forcibly remove his police badge from his vest and his police radio from his belt. One to two seconds after Young's grip on Officer Fanone's wrist was broken by a riot shield moving chaotically through the crowd above the rioters' heads, Sibick's hands are visible on Officer Fanone's body-worn camera gripping both the badge and police radio.

While Young was assaulting Officer Fanone, members of the crowd yelled, "Kill him!" and "Get his gun!" Officer Fanone felt grabbing and pulling on his body and uniform the entire time he was in the crowd. Officer Fanone was primarily focused on keeping his gun secure. He stated on body-worn camera, Exhibit 8.2**,** at time stamp 15:37:23-33, "That scared the shit out of me. They were trying to take my gun. I was holding on to my gun . . . for dear life." The assault ended when a group of individuals in the crowd surrounded Officer Fanone to protect him from his attackers and escorted him back to the police line, where he lost consciousness. Officer Fanone

27

was later transported to the Emergency Room after he regained consciousness. His injuries are described below.

An independent photojournalist, Mel Cole, witnessed the assault on Officer Fanone and reported that he heard someone yelling "Kill him with his own gun." *See* Exhibit 9.[15] In an interview with the FBI, co-defendant Sibick also reported that he witnessed at least two individuals trying to grab Officer Fanone's gun and that he heard someone say to get his gun and kill him.

A video taken by a member of the crowd on the LWT depicts the assault on Officer Fanone after Head dragged him from the tunnel and into the crowd. A clip from this video is included as Exhibit 10. An edited version of this video is also included as Exhibit 10.1. This version has been edited to include an arrow to identify Young and a highlight box to follow Young while he's in the crowd. The video is also slowed down at points to highlight Young's assault on Officer Fanone, as well as his subsequent assault on Officer M.M.

Exhibit 10 depicts Young watching from a distance as Head pulled Fanone into the crowd. Young then pointed in the direction of the assault on Officer Fanone and quickly and forcefully moved through the crowd to join the attack while Young's 16-year-old son followed behind him.

---

[15] This interview is also available at https://www.bbc.com/news/av/world-us-canada-55621856.



**Exhibit 10A** *(minute marker 00:18)*



**Exhibit 10B** *(minute marker 00:23)*

Young fought his way through the crowd and lunged in Officer Fanone's direction repeatedly while Head pulled Fanone deeper into the crowd.



**Exhibit 10C** *(minute marker 00:33)*

Rodriguez simultaneously moved toward Officer Fanone and positioned himself to apply

the taser to the back of Fanone's neck. Officer Fanone reacted in pain, pulling away and holding

his hand to his neck and face.



**Exhibit 10D** *(minute marker 00:36, Young is obscured by the "Blue Lives Matter" flag)*

Seconds later, Rodriguez again held the taser to the back of Officer Fanone's neck, and

Young lunged toward Officer Fanone. The sound of the taser being activated is audible on the

video. Officer Fanone again reacted in pain.



**Exhibit 10E** *(minute marker 00:40)*

Young then grabbed Officer Fanone's wrist and restrained him by pulling his arm away from his body when the officer is at his most vulnerable, reeling from the assault with the taser. At the same time that Young is restraining Fanone's left arm, another rioter restrained Fanone's right arm such that the officer's arms are spreadeagle.



**Exhibit 10F** *(minute marker 00:44)*

Young continued to restrain Officer Fanone for several seconds. During that time,

Rodriguez moved the taser again toward Officer Fanone, although the "Blue Lives Matter" flag blocks the next moment.



**Exhibit 10G** *(minute marker 00:46)*

Young's grip was broken when a riot shield passes over Fanone, and the officer is swept further into the crowd.



**Exhibit 10H** *(minute marker 00:46)*

Young's assault of Officer Fanone is also depicted on Officer Fanone's body-worn camera

at time stamp 15:19:17-24.[16] *See* Exhibit 8.1. Young's face is visible on the body-worn camera at

time stamp 15:19:17 as Young lunged toward the officer, attempting to grab him. Officer Fanone

can be heard screaming in pain at 15:19:18, as Daniel Rodriguez applied the taser to the back of

Fanone's neck. Young is visible at 15:19:20 as Rodriguez briefly turns away.



**Exhibit 8.1A**



**Exhibit 8.1B**

Young then grabbed Officer Fanone's arm at time stamp 15:19:21, maintaining control of

the officer's arm until sometime between 15:19:23 and 15:19:24. Fanone can be heard screaming

in pain at 15:19:21-22.

---

[16] The body-worn camera time stamp is in military time. The time 15:19:17 is the equivalent of 3:19:17 p.m.



**Exhibit 8.1C**

As Young restrains Officer Fanone at 15:19:23, Young's co-defendant Thomas Sibick reached toward the officer's vest. At 15:19:24, Sibick pulls back his left hand with Officer Fanone's badge visible between Sibick's fingers. By 15:19:25, both Officer Fanone's badge and his police radio are visible in Sibick's hands.



**Exhibit 8.1D**

34



**Exhibit 8.1E**



**Exhibit 8.1F**



**Exhibit 8.1G**

Young's Assault on USCP Officer M.M.

After Young's grip on Officer Fanone's wrist was broken, Young momentarily watched Officer Fanone being swept into the crowd. He then turned his attention back to the Capitol building. Young moved purposefully toward where USCP Officer M.M. had recently been pulled into the crowd. Young reached toward Officer M.M., who had just been sprayed with bear spray, causing his eyes to sting, and who was disoriented from being swept into the mob. Young joined the assault on this distressed officer by reaching toward him and grabbing at his helmet and body, pushing him, and hitting him.



**Exhibit 10I** *(minute marker 00:53, Young's hand is on Officer M.M.'s helmet in this screenshot)*



**Exhibit 10J** *(minute marker 00:54, Officer M.M. is below Young's hands in this screenshot)*

Officer M.M. remembered struggling against the mob but does not remember some of the

36

specific events as a result of being disoriented and having impaired visibility due to the bear spray. While Officer M.M. was in the crowd, two men protected him and escorted him to Constitution Avenue. By the time he made it to Constitution Avenue, Officer M.M. noticed his neon-colored visibility vest was ripped, but he does not remember how it happened during the struggle in the mob.

Another video, Exhibit 12, depicts Officer M.M.'s assault from another angle. Exhibit 12 has been modified to identify Young at the beginning of the video, as it shows Officer Fanone being pulled into the crowd. After the video shows Young assaulting Officer Fanone, Young is visible assaulting Officer M.M. Although Officer M.M. is not visible in the video, it is apparent that Young is hitting Officer M.M. when the video is compared for context to Exhibit 10. The portion of the video in which Young assaulted Officer M.M. is slowed down and repeated in Exhibit 12.

### *Young's Statements*

#### Statements to the Political Trance Tribune

Around 4:00 p.m. on January 6, 2021, Young and his son were interviewed on an open-source video, provided as Exhibit 11,[17] from the Political Trance Tribune.[18]  In the video footage, Young and his son are standing immediately outside the tunnel on the LWT, nearly two hours after

---

[17] The video is also available at https://www.youtube.com/watch?v=XgNfcXwjrQY. The start time of this video is estimated to be 4:00 p.m. because at the 2:30 minute marker in the video, rioter Edward Lang, 21-cr-053 (CJN), is visible body-surfing into the tunnel. Lang is also visible body-surfing in surveillance footage of the tunnel at time stamp 4:01 p.m.

[18] Political Trance Tribune is a YouTube channel, which can be found at https://www.youtube.com/channel/UCpvxrbz4mTyPO0AKR3gb4NQ. The creator of the channel identifies as an "investigative video journalist." *See* https://www.youtube.com/user/PoliticalTrance/about.

the assaults on Officers Fanone and M.M. The reporter asks Young's son for his name, age, and where he is from. The boy says his name, that he is 16 years old, and from Iowa. Young is visible in the video, and when the reporter asked if Young is the boy's dad, Young said "yes" and said his name is "Kyle." The interviewer then stated, "I am a First Amendment auditor. I don't let cops push me around and I like cops. I got good cops that help me do what I do." Young replied, "There's good cops and bad cops." The video pans away from Young and shows him standing behind a rioter screaming, "Pull the cops out! Pull the police! Grab their hands and pull them out! We've got to pull them out!"

<u>Young's Attempt to Surrender to Law Enforcement Officials</u>

On January 27, 2021, a Deputy U.S. Marshal in Iowa was notified by Court Security Officers that an individual, who turned out to be Young, was there with his wife to turn himself in. The Deputy Marshal met with Young, who had a copy of a BOLO[19] photo of himself. Young pointed to his picture and stated that it was him and that he was there to turn himself in. Young stated he was at the Capitol but lied that he did not have "anything to do with the riots." Young said he was notified by a cousin that his photograph was on the news. The Deputy Marshal verified Young's identity by his state-issued photo ID and by his resemblance to the BOLO photo and then contacted the FBI. Young was not arrested at the time because a warrant for his arrest had not yet been issued.

---

[19] "BOLO" stands for "Be on the lookout." BOLO photos are created by law enforcement to identify individuals who are suspected of committing crimes.

### *Officer Fanone's Injuries*

Officer Fanone sustained significant and painful injuries on January 6, 2021. The officer experienced excruciating pain each time Rodriguez repeatedly applied a taser to the back of his neck. Officer Fanone can be heard screaming on his body-worn camera on three separate occasions—at minute markers 15:19:15, 15:19:17, and 15:19:21-22. The tasing caused burn marks to the back of Officer M.F.'s neck that resulted in scarring.



**Exhibit 13** *(photo taken on March 3, 2021)*

After Officer Fanone was escorted back to the police line, his body-worn camera depicts him collapsing at 15:21:09, followed by another officer announcing, "Officer down!"



**Exhibit 8.1H**

39

Other officers dragged Officer Fanone's limp body inside the Capitol building. One of the officers yelled "We need a medic! We need EMTs now!" as Officer Fanone's unconscious face is slumped over his chest, making it visible in the body-worn camera.



**Exhibit 8.1I**

Officers continue to carry Officer Fanone, as his MPD partner arrives and starts talking to Officer Fanone—"Mike, stay in there buddy. Mike, it's Jimmy, I'm here."



**Exhibit 8.1J**

In the footage, Officer Fanone's partner opens Fanone's vest to help him breathe. One officer addresses Officer Fanone—"Come on, wake up, brother. Talk to me man." Officer Fanone's partner also continues to try to revive him: "Come on, Mike. Come on, buddy, we're going duck hunting soon." Another officer says, "Fanone, Fanone, you alright, brother?"

At time stamp 15:23:33 in the BWC footage, nearly two and a half minutes after his initial collapse, Officer Fanone regains consciousness. His first words are, "Did we take the door back?" Officer Fanone then walked outside where a medic performed a medical assessment.

Officer Fanone's MPD partner later transported him to the Emergency Room of MedStar Washington Center, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ █ ███████████████████████████████████

██████████████████████████ █ ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████

      ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████



## III.   THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Young with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), two counts of Civil Disorder in violation of 18 U.S.C. § 231(a)(3), two counts of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Robbery in violation of 18 U.S.C. § 2111, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Impeding Ingress and Egress in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(3), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E), and Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 5, 2022, Young pled guilty to Count Four, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Officer Michael Fanone).

## IV.    STATUTORY PENALTIES

Young now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, Young faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Four, Assaulting, Resisting, or Impeding Certain Officers.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

Offense Level

The Government agrees with the Sentencing Guidelines calculation set forth in the PSR, and as agreed upon by the parties in the plea agreement. In the PSR, the Probation Office calculated Young's offense level as 24, applying the following enhancements to a base offense level of 14 (U.S.S.G. § 2A2.2(a)):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Victim Sustained Serious Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3A1.3 | Physical Restraint | +2 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of Responsibility | -3 |
| **Total Offense Level:** | | **24** |

*See* PSR ¶¶ 44-55; Plea Agreement at ¶ 5(A).[22]

Per the Plea Agreement, Young "reserves the right to challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense did not involve the victim being physically

---

[22] Based on the facts and circumstances of Young's case, the Government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 77-96 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

restrained in the course of the offense." Plea Agreement at ¶ 5(A). For the reasons set for below, the facts of this case firmly support the application of the enhancement.

### *A Two-Level Upward Enhancement for Restraint of a Victim Applies to Young's Assault of Officer Fanone*

Chapter 3 of the Guidelines provides for a two-level, victim-related upward enhancement "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. Application Note 1 to U.S.S.G. § 3A1.3 clarifies that the applicable definition of "physically restrained" is found in the Commentary to U.S.S.G. § 1B1.1: "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L). Courts, including the D.C. Circuit, have consistently held that the victim "being tied, bound, or locked up" is not a requirement for physical restraint, but instead a non-exhaustive list of examples of physical restraint. *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) ("the use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation") (quoting *United States v. Anglin,* 169 F.3d 154, 163 (2d Cir.1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Nineth, and D.C. Circuits).

Circuit courts have varying approaches to determining the availability of physical restraint enhancements under the Guidelines. *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh and Ninth Circuits in cases

involving two-level enhancements for use of physical restraint in robberies). The Third Circuit recently developed an approach incorporating various considerations adopted by the other Circuits, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here"). The five factors identified by the Third Circuit are:

    1. Use of physical force;

    2. Exerting control over the victim;

    3. Providing the victim with no alternative but compliance;

    4. Focusing on the victim for some period of time; and

    5. Placement in a confined space.

*Bell*, 947 F.3d at 56.[23] Each factor will be addressed below.[24]

    1. <u>Young used physical force against Officer Fanone.</u>

    The D.C. Circuit Court has found that "physical restraint requires the defendant either

---

[23] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases interpret the meaning of "physically restrained" as it is used in § 3A1.3.

[24] Judge Mehta recently relied on the *Bell* factors in deciding to apply the § 3A1.3 enhancement in *U.S. v. Thomas Webster*, 21-cr-208 (APM), a January 6 assault on a federal officer case in which the defendant tackled the victim officer to the ground and attempted to strip the officer of his gas mask while he was enveloped by the mob.

to restrain the victim through bodily contact or to confine the victim in some way." *Drew*, 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C.Cir.1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)). Here, Young made direct bodily contact with Officer Fanone—grabbing the officer's left wrist, pulling his arm away from his body, and holding the arm while other rioters assaulted him.

Similar conduct has been found by courts to involve physical restraint under the Guidelines. For instance, in *United States v. Johnson*, 492 F.3d 254 (4th Cir. 2007), the court held that the defendant gripping the victim's arms while another co-defendant (sexually) assaulted her qualified as physical restraint under the Guidelines. *Id.* at 256-57; *see id.* "We … hold here that Johnson's act of gripping the victim's arms and holding her down while Hodge raped her is sufficiently akin to the definition's examples (being tied, bound, or locked up) to constitute forcible restraint. His act therefore qualifies as physical restraint under the guidelines' definition." Young's conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact." *See supra* at page 31 (Exhibit 10F).

2.  Young exerted control over Officer Fanone.

Consistent with the definition of "restrained" and examples of being physically restrained provided in the Guidelines ("being tied, bound or locked up"), a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner." *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to

check; to hold from action, proceeding, or advancing'") (internal citations omitted); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls… 'Forcible' means effected by the use of force") (internal citations omitted). *See also id*. (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back (pretending it was a gun), and he grabbed another woman, a customer service representative, as well).

Here, when Young grabbed Officer Fanone's left wrist and pulled the officer's arm away from his body during the assault, he prevented the officer from having control over his duty belt. An MPD officer's duty belt generally includes Department-issued handcuffs, a holstered service weapon (*i.e.*, gun), additional ammunition (two magazines), oleoresin capsicum ("OC") spray, and a police baton, among other items. *See* District of Columbia Metropolitan Police General Order, GO-PER-110.11 (Uniform, Equipment, And Appearance Standards), Effective Date July 3, 2019, pp. 16-17, ¶II (C)(4)(b), available at https://go.mpdconline.com/GO/GO_110_11.pdf. Officer Fanone discussed the rioters shouting to take his MPD-issued service weapon from him to use against him during the brutal assault:

> Because I was among a vastly outnumbered group of law enforcement officers protecting the Capitol and the people in it, I was grabbed, beaten, tased, all while being called a traitor to my country. I was at risk of being stripped of, and killed with, my own firearm as I heard chants of, 'Kill him with his own gun!' I can still hear those words in my head now… I just remember getting violently assaulted from every direction and eventually found myself out 250, maybe 300 feet away from the mouth of the tunnel… I was trying to push guys off of me, create some space. All the while I recognized the fact that there were individuals that were trying to grab a hold of my gun. I remember [one] of them distinctly lunging at me time and time again trying to grab my gun. And I heard people in the crowd yelling, "Get his gun, kill him with his own gun," and words to that effect.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone), available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

By holding Officer Fanone's arm away from his body, particularly while he was already surrounded and being assaulted by the large crowd of rioters and was weakened by having just been repeatedly tased, Young prevented the officer from being able to both grab a weapon from his duty belt to protect himself and to protect his gun and the various other weapons in his duty belt that could have be stolen by rioters and used against him in that moment.

Second, Young prevented the officer from protecting himself from Rodriguez, who repeatedly tased him. Officer Fanone has stated, "I was struck with a taser device at the base of my skull numerous times, and they continued to do so until I yelled out that I have kids." *Id.* Based on the officer's body-worn camera footage and the distinct screams of pain he emitted each time he was tased, Officer Fanone was tased multiple times literally seconds before Young grabbed his wrist and restrained his arm. Officer Fanone can also be heard screaming in pain while Young is restraining his wrist.[25] *See supra* at pages 31-32.

3. <u>Young provided Officer Fanone with no alternative but compliance.</u>

In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of § 3A1.3 where the defendant had stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." Id. at 320-21 (internal citations omitted).

---

[25] Officer Fanone can be heard screaming on his body-worn camera on three separate occasions—at minute markers 15:19:15, 15:19:17, and 15:19:21-22 on Exhibit 8.1. Young grabbed Officer Fanone's arm at time stamp 15:19:21, maintaining control of the officer's arm until sometime between 15:19:23 and 15:19:24.

Here, Officer Fanone similarly was stuck in the dangerous rioting crowd unable to fight back while being assaulted by rioters as Young held on to his wrist and kept his arm away from his body. After being tased multiple times and then grabbed by the wrist with his arm held away from his body, Officer Fanone was incapacitated and unable to do anything about his situation because of the physical restraint.

Footage from Officer Fanone's body-worn camera confirms this point. The body-worn camera shows that as Young was gripping the officer's left arm, Sibick reached toward Officer Fanone. As Young's grip of Fanone's wrist was broken, Sibick grabbed two items from the officer's duty belt and vest over the next two seconds—Fanone's badge and his police radio.[26] *See supra* at pages 34-35 (Exhibits 8.1D-G).

Notably, the badge and radio were taken from Officer Fanone's left side—the same side on which Young is holding Fanone's arm. Similar to the victim in *Rosario*, Officer Fanone could not fight back as his items were being taken from him as he had been weakened by the taser and essentially immobilized by Young.

4.   The brief duration of the restraint does not preclude application of the enhancement.

Another consideration is the duration of the defendant's restraint of the victim. *Bell*, 947 F.3d at 59. While sustained restraint may militate in favor of applying the enhancement, it is not required. *See, e.g., United States v. Coleman*, 664 F.3d 1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Foppe*, 993 F.2d

---

[26] Young's grip on Officer Fanone's wrist was broken at some point between 15:19:23 and 15:19:24 as a riot shield careened over everyone's head. Exhibit 8.1D shows Young still maintaining his grip on Officer Fanone's wrist as the riot shield is beginning to come over them. Sibick is reaching in at this point to commit the robbery of Fanone's badge and police radio.

1444, 1452–53 (9th Cir. 1993) ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (finding that the victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines. *Bell*, 947 F.3d at 56. Also, the Court in *Bell* made clear that "[n]o single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60. Here, while Young's restraint of Officer Fanone was brief, context matters greatly. The restraint occurred after rioters had called for Officer Fanone to be stripped of his gun and killed with it, and after Officer Fanone had been tased in the back of the head/neck literally seconds before, and while he was in the middle of a hostile crowd, grabbing at his weapon-filled duty belt. In that context, although the duration of the restraint was brief, that brief period coincided with the moment when Officer Fanone was at him most vulnerable. Consequently, the brevity of the restraint should not preclude application of the enhancement.

5. Young, in conjunction with the rioting crowd, placed Officer Fanone in a confined space.

In addition to grabbing the officer's wrist and holding his arm away from his body while he was being assaulted by rioters, Young also stood directly in front of Officer Fanone while the officer was otherwise surrounded by an angry and violent mob of people assaulting him. *See supra*

at page 33 (Exhibit 8.1C).

Young positioning himself in front of Officer Fanone, while grabbing the officer's wrist and holding the officer's arm away from the officer's body, helped to confine Officer Fanone further within the rioting crowd. Such behavior—blocking egress—is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § 1B1.1. For instance, in *United States v. DeLuca*, the First Circuit found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]," even though the victim was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § 1B1.1, comment. (n.1(i))] are merely illustrative…not exhaustive"). 137 F.3d 24, 39 (1st Cir. 1998). Young's posture directly in front of Officer Fanone was made even more confining by the fact that the person tasing Officer Fanone had been doing so behind the officer, making the easiest and most instinctual method of escape to move forward and away from the taser behind him. In addition to grabbing and holding the officer, Young blocked Fanone's potential path of escape.

6.  <u>Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.</u>

Application Note 2 for U.S.S.G. § 3A1.3 notes that the restraint-of-a-victim enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))." U.S.S.G. § 3A1.3 cmt. n. 2. The Tenth Circuit has indicated that courts should "determine whether

the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original). Additionally, in order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the offense. *United States v. Benitez-Torres*, 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)). When conducting this inquiry, courts should consider whether "the act of physical restraint "adds to the basic crime." *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999) (quoting *United States v. Mikalajunas,* 936 F.2d 153, 156 (4th Cir.1989)).

Here, the offense guideline for the 18 U.S.C. § 111 offense (§ 2A2.2) does not specifically incorporate physical restraint. The specific offense characters for § 2A2.2, such as the enhancement for bodily injury sustained by the victim, applied here, do not necessarily involve conduct constituting physical restraint and can appropriately be applied in tandem with the victim restraint adjustment in § 3A1.3. *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*, 142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under § 3A1.3 when the bodily injury enhancement applied.). Additionally, unlawful restraint of a victim is not an element of a Section 111(a) violation. Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official

duties.  Not all assault includes physically restraining a victim. As noted above, restraint

principally defined as "to hold back; to check; to hold from action, proceeding, or

advancing." *Taylor*, 961 F.3d at 78. Hence it is clear that while assault involves some force, but

it does not necessarily involve restraint. Physical force is distinct from qualifying physical

"*restraint*." *Id.* at 78–79 (citing *Rosario*, 7 F.3d at 321 ("[M]ere physical contact with the victim

does not inevitably amount to physical restraint")). For instance, in *United States v. Wilson*, the

Fourth Circuit upheld the two-level physical restraint enhancement for a carjacking, noting that

physical restraint was not an element in all robberies or the other specific offenses

characteristics. 198 F.3d at 472 (4th Cir. 1999). By contrast, the Court explained that the restraint

adjustment was not applicable to a conviction for murder, because ""[e]very murder involves the

ultimate restraint[, and s]uch terminal restraint is simply an element of the crime of

homicide." *Id.* (quoting *Mikalajunas,* 936 F.2d at 156). Fortunately, Officer Fanone survived the

assault on January 6, largely because of other rioters who belatedly came to his assistance, and

no thanks to Young.

Here, Young purposely holding Officer Fanone back while the officer was trying to escape

the terror of violent mob is meaningfully different from a typical assault in a way that makes clear

that it is not a typical factor in the guidelines or elements of the ordinary assault. Accordingly, the

Chapter 3 adjustment for restraint of a victim should apply in the instant case.

*******

The U.S. Probation Office calculated Young's criminal history as category IV, which is

not disputed.[27] PSR ¶ 63. Accordingly, based on the Government's calculation of Young's total

---

[27] The Government is not seeking a career offender designation, which is noted as a possible designation in ¶ 13 of
the PSR.

adjusted offense level, after acceptance of responsibility, at 24, Young's Guidelines imprisonment range is 77 to 96 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

The nature and circumstances of Young's crimes weigh heavily towards a significant term of incarceration. As described in thorough detail above, Young's protracted and repeated assaults against numerous police officers inside and directly outside the LWT tunnel mark him as one of the most violent rioters who attacked the Capitol on January 6. There can be no serious dispute that the nature and circumstances of this case support a custodial sentence within the applicable Sentencing Guidelines range, as the Government has requested. Had Young been convicted of two

54

counts of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), he would be subject to consecutive sentences—potentially higher than the 8-year statutory maximum for a single count. The seriousness of Young's conduct, including his multiple assaults on uniformed police officers, demands a lengthy sentence of imprisonment.

### B.  Young's History and Characteristics

Young was a HVAC laborer who was employed in West Des Moines, Iowa until his arrest. PSR ¶ 101. Young has a significant criminal history, as described in the PSR at pages 11-17, which weighs in favor of a lengthy period of incarceration. The more significant offenses are set forth in detail below:

- In December 2003, Young was sentenced in Wayne County, Iowa to consecutive terms of 10 years' imprisonment for conspiracy to manufacture methamphetamine and 5 years' imprisonment for possession of a lithium, a precursor of methamphetamine. While serving that prison sentence, Young was repeatedly cited for misconduct, three of which involved threats or violence. Young was paroled in June 2006, then revoked approximately one year later, paroled again in December 2009 only to revoked again in June 2011. Young was then paroled in April 2012 and discharged approximately two years later. PSR ¶ 60

- In May 2007, Young was sentenced in Clarke County, Iowa to 5 years of imprisonment for being a felon in unlawful possession of a firearm. He was paroled in December 2009, then revoked in June 2011, and paroled again in 2012. His parole was discharged approximately 2 years later. PSR ¶ 61.

- In July 2010, Young was charged with Conspiracy to Deliver More than Five Grams of Methamphetamine, and pled guilty to a lesser included offense in June 2011, resulting in a sentence to 5 years of imprisonment. He was paroled in April 2012 and his parole was discharged two years later. PSR ¶ 62.

Plainly, unlike many other January 6 defendants, Young's crimes on January 6 were not the product of an isolated event in an otherwise law-abiding life. They came, instead, after a long series of criminal offenses. Although Young's convictions are for property or drug crimes, his

history of citations while serving prison time include repeated violations for threatening or assaultive behavior. *See* PSR ¶ 60.

As noted above, Young identified himself on January 27, 2021, when he tried to turn himself in after seeing a BOLO. He stated he was at the Capitol but lied that he did not have "anything to do with the riots." The Government has recommended a sentence at the midpoint of the guidelines notwithstanding the heinous and prolonged nature of the assaults, including their significance to the larger events of January 6, in part because of his early cooperation and self-identification. In the balance, Young's history and characteristics, including his lengthy criminal history, weighs heavily in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Young's criminal conduct, assaulting a police officer who was in the course of performing his official duties, is the epitome of disrespect for the law. Police officers were overwhelmed, outnumbered, and in some cases, including Officer Fanone's case, in serious danger.  During his hours at the mouth of the LWT tunnel, Young exacerbated this danger by deploying a pole, box speaker, and a strobe light against the police line, passing weapons such as shields and a taser to others, and then directly assaulting and restraining Officers Fanone and M.M. Young did all of this while accompanied by, and while encouraging similar participation from, his minor son.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[28] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, Young has been sentenced to fairly lengthy terms of incarceration for prior nonviolent felonies—15 years in one case and 5 years respectively in his two subsequent cases. *See* Section VI(B) *supra.* His conviction in this case for assaulting a police officer in the context of a violent attack on the democratic process is significantly more serious than his prior convictions.  As his prior convictions and prison sentences did not deter his criminal conduct on January 6, the need for specific deterrence supports the Government's recommendation for a lengthy term of imprisonment.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[28] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Accordingly, courts must give "respectful consideration to the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007 "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Young and others like him committed on January 6 are unprecedented. Mechanical comparison to assault cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts. January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.

As of the date of this sentencing memorandum, several Capitol riot defendants have been sentenced for assaulting police officers. For instance, in *United States v. Fairlamb*, 21-cr-120 (RCL), the defendant armed himself with a police baton and incited violence outside of the Capitol. He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing a weapon. Fairlamb also assaulted an MPD officer by shoving the officer and punching the officer's face shield. On another occasion, Fairlamb also assisted police officers, telling other rioters to

leave them alone and assisting them in relocating to another area. Fairlamb pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a). Judge Lamberth imposed a 41-month sentence.

In *United States v. Languerand*, 21-cr-353 (JDB), the defendant threw multiple objects at the police officers guarding the Capitol in the Lower West Terrace tunnel, and afterwards bragged on social medial about his role in the riot. When Languerand's room and trailer were searched, law enforcement officers found a large number of weapons, as well as notebooks containing militaristic language seemingly referring to Washington, D.C. Languerand pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1) and (b). Judge Moss imposed a 44-month sentence.

In *United States v. Devlyn Thompson*, 21-cr-461 (RCL), the defendant and other rioters fought police officers in the LWT tunnel for approximately 13 minutes. Specifically, Thompson encouraged other rioters, threw objects at officers, and hit one officer on the hand with a metal baton causing a bruise. Thompson self-surrendered and agreed, before he was arrested, to plead guilty to a violation of 18 U.S.C. § 111(a)(1) and (b). In that case, the Government recommended a sentence of 48 months' imprisonment, in part based on Thompson's turning himself in and then cooperating with the Government by providing information at multiple debrief meetings before accepting a plea offer. Judge Lamberth imposed a 46-month sentence.

In *United States v. Creek*, 21-cr-645 (DLF), the defendant's conduct included shoving one police officer back several feet before striking that officer on the face shield portion of his helmet and pushing a second police officer down then kicking him. Creek brought first-aid supplies, mace, a knife, binoculars, and a radio with him on January 6. Creek pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1). In that case, the Government recommended a sentence of 27 months'

imprisonment. Judge Friedrich imposed a 27-month sentence.

In *United States v. Duke Wilson*, 21-cr-345 (RCL), the defendant, over the course of approximately 14 minutes, Wilson prevented officers from closing the doors in the LWT tunnel, allowing other rioters to pry them open and attack officers.  Then, Wilson punched police officers, attempted to take their shields, threw objects at them, and struck at officers with a PVC pipe. Wilson pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a). Judge Lamberth imposed a 51-month sentence.

In *United States v. Palmer*, 21-cr-328 (TSC), the defendant threw a wood plank at officers, then deployed the contents of a fire extinguisher directly into the tunnel and threw the empty extinguisher at the officers. For the next several minutes, Palmer continued to push and throw objects at the officers in the tunnel. Later, on the Upper West Plaza, Palmer approaching a line of officers, yelled at them, and threw a pole at them. Palmer pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1) and (b). Judge Chutkan imposed a 63-month sentence.[29]

In *United States v. Miller*, 21-cr-75 (RDM), the defendant, while on the West Plaza, threw a full beer can in the direction of police. He then scaled a wall, went to the LWT, then threw objects and sprayed a fire extinguisher at police officers in the tunnel. Miller pled guilty to two counts: violations of 18 U.S.C. §§ 1512(c) and 111(a). Judge Moss imposed a 33-month sentence.

The instant case includes several factors not present in any of the listed cases. First, the seriousness of the context in which the assault was committed and the terror which it inflicted.

---

[29] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1 because of his post-plea conduct. Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

Like Palmer, Young repeatedly assaulted and harassed officers in the tunnel. But Young took his conduct one step further when he purposely sought out an opportunity to assault Officer Fanone, and then in the moment when Officer Fanone had every reason to fear for his life, Young endangered the officer's life by physically restrained him. Second, while Young did not use any weapons in his assault at issue here, his conduct during the day involved multiple weapons in other contexts. Specifically, Young passed a taser to Daniel Rodriguez while they were together in the LWT tunnel, and Young threw a speaker toward officers while he was in the tunnel, as well as jabbing a pole toward officers while they were holding up plastic riot shields to protect themselves. Third, Young's actions were directly connected to injuries. In the tunnel, the speaker that Young threw resulted in a bleeding wound to another rioter's head. Most significantly, Young contributed to Officer Fanone's serious injuries by restraining the officer immediately after Rodriguez repeatedly applied a taser to the back of the officer's neck, rendering the officer helpless and unable to flee to safety amidst yells to "kill him with his own gun." Other cases have lacked such a link to serious bodily injury, worthy of the five-point enhancement. Finally, Young has a significant criminal history, not present in any of the cases listed above. Indeed, nearly all the other January 6 assault defendants have zero criminal history; that is not the case for Young.

One January 6 assault case has garnered a sentence longer than the recommended sentence here: *United States v. Webster*, 21-cr-208 (APM). The defendant was convicted at trial of multiple counts, including one count of 18 U.S.C. 111(b) for use of a flagpole in an assault against MPD Officer Rathbun. Judge Mehta imposed a 120-month sentence. The *Webster* case garnered a higher guidelines range (210 to 262 months), not only because the counts of conviction had a higher base offense level (an additional 2 points for conviction under 18 U.S.C. § 111(b) and an additional 4

points for use of dangerous weapon), but also because Webster's additional conduct required several base offense level enhancements not present in the instant case. Specifically, Webster received a four-point enhancement for use of body armor in a crime of violence and a two-point enhancement for obstruction the administration of justice. And, of course, Young should receive a three-point reduction for acceptance of responsibility, which was not available to defendant Webster after he took his case to trial.

Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under

the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. [30] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the Government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[31] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by

[30] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[31] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Applying these principles to this case leads to the conclusion that Young should be required to pay at least $2,000 in restitution, though the Court should defer entry of a restitution order at this time. The VWPA and MVRA provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). This Court should order Young to pay restitution to the MPD, the employer of Officer Fanone, to

the extent it paid any expenses for his medical treatment. *See* 18 U.S.C. § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation.") The Government requests that any restitution order that takes into account losses suffered by the MPD as a result of Young's attack on the officer be delayed for 90 days so it can determine those costs borne by the entity. *See* 18 U.S.C. § 3664(a)(5).

## VIII.  CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of imprisonment of 86 months, which is in the middle of the guideline range as calculated by the United States Probation Department, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
ACTING UNITED STATES ATTORNEY

BY:   /s/ *Cara A. Gardner*
CARA A. GARDNER
Assistant United States Attorney
D.C. Bar 1003793
U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
202-252-7009
Cara.Gardner@usdoj.gov

   /s/
KIMBERLY L. PASCHALL
Assistant United States Attorney
D.C. Bar No. 1015665
601 D St, N.W.,
Washington, D.C. 20001
202-252-2650
Kimberly.paschall@usdoj.go

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 12, 2022, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

<div align="center">

*/s/ Cara A. Gardner*
Cara A. Gardner
Assistant United States Attorney

</div>